UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
RENTOKIL-INITIAL PENSION SCHEME,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

vs.

CITIGROUP INC., SANFORD I. WEILL,
CHARLES O. PRINCE, III, ROBERT E.
RUBIN and VIKRAM PANDIT,

Defendants.
—————————————————————————

Civil Action No.

**12 CV 6653**

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

                                                                              **Page**

I.     INTRODUCTION .................................................................................................1

II.    SUMMARY OF ACTION .....................................................................................2

       A.    Citigroup's Failure to Disclose Its CDO Exposure ...................................2

       B.    Citigroup Understated Its Loan Loss Reserves .........................................5

       C.    Citigroup Misrepresented that It Was "Well Capitalized" .......................5

       D.    Citigroup Misrepresented Assets Contained in Its Structured Investment
             Vehicles ......................................................................................................6

       E.    GAAP Violations........................................................................................6

III.   JURISDICTION AND VENUE ............................................................................9

IV.    PARTIES ...............................................................................................................10

       A.    Plaintiff .....................................................................................................10

       B.    Defendants ................................................................................................10

V.     BACKGROUND ...................................................................................................11

       A.    Residential Mortgage Loan Categories ...................................................12

       B.    Subprime Loans and the Secondary Market.............................................13

       C.    The Secondary Market...............................................................................14

       D.    Citigroup's Involvement in Mortgage-Related Activities .......................17

       E.    Citigroup's CDOs .....................................................................................18

       F.    Citigroup's SIVs .......................................................................................19

VI.    CITIGROUP'S EURO NOTE SECURITIES OFFERINGS ...............................20

VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
       OMISSIONS MADE IN THE OFFERING DOCUMENTS................................20

       A.    False and Misleading Statements Regarding Citigroup's CDO Exposure ............20

Page

B.   False and Misleading Statements Regarding Allowance for Loan Losses
and Stated Reserves ...................................................................................22

C.   False and Misleading Statements Regarding Citigroup Being "Well
Capitalized" ...............................................................................................25

D.   False and Misleading Statements Regarding the Quality of SIV Assets...............28

E.   Citigroup's False Financial Statements ..................................................29

1.   Citigroup Failed to Disclose that It Had Direct Exposure to as
Much as $66 billion of CDOs in Violation of SFAS 107..........................30

2.   Citigroup Failed to Consolidate or Disclose Off-Balance-Sheet
Liquidity Puts in Violation of FIN 46(R) ...................................33

3.   Citigroup Failed to Record Adequate Loan Loss Reserves on Its
Portfolio of Subprime Mortgages in Violation of SAB 102, SFAS
114 and SFAS 5 ....................................................................34

4.   Citigroup Failed to Record Adequate and Timely Write-downs on
CDOs in Violation of SFAS 157 and SFAS 115 .......................................40

F.   Citigroup's SEC Filings Contained False and Misleading Statements ................45

VIII.   LOSS CAUSATION ....................................................................................56

IX.   STATUTE OF LIMITATIONS........................................................................57

X.   CLASS ALLEGATIONS ................................................................................57

COUNT Section 90 of the United Kingdom's FSMA................................................58

PRAYER FOR RELIEF ................................................................................60

JURY DEMAND................................................................................................61

## I.     INTRODUCTION

1.     This is a securities class action brought pursuant to Section 90 of the United Kingdom's Financial Services and Markets Act 2000 ("FMSA") to recover billions of dollars of losses suffered by purchasers of medium-term Euro Notes ("Euro Notes") issued and sold by Citigroup Inc. ("Citi" or "Citigroup" or the "Company") between October 12, 2005 and February 25, 2009 (the "Relevant Period").

2.     Plaintiff Rentokil-Initial Pension Scheme brings this action on behalf of itself and all others who purchased Euro Notes during the Relevant Period pursuant to false and misleading Offering Documents and were damaged thereby.[1]  The Euro Notes were each sold pursuant to Citigroup Euro Medium-Term Note Programmes (the "Programmes"). Each of the Programmes utilized a Base Prospectus issued pursuant thereto, commencing October 12, 2005. The Base Prospectuses were materially false and misleading as they incorporated by reference false financial statements, prepared and approved in New York, which were filed with the U.S. Securities and Exchange Commission ("SEC") and violated Generally Accepted Accounting Principles ("GAAP"). By their terms, the Base Prospectuses were each governed by English law and the notes sold thereby were each denominated in one of four currencies: Euros, Pounds Sterling, Danish Kroner and Swiss Francs.

3.     Section 90 of the FMSA is a strict liability statute. Plaintiff specifically disclaims any allegations of fraud or willful or reckless wrongdoing. Although this action does *not* include any securities included in, and the subject of, *In re Citigroup Inc. Bond Litigation*, 08-cv-9522

---

[1]     The 26 Euro Notes at issue here were each issued pursuant to the "Offering Documents" identified in Appendix A hereto. The Offering Documents include the applicable Base Prospectuses, Prospectus Supplements and all documents incorporated by reference therein.

(S.D.N.Y.) (Stein, J.), many of the misrepresentations alleged in this Complaint are also alleged in, and have been deemed to state a claim in, that action.

## II.    SUMMARY OF ACTION

4.      Beginning in the early 2000s, Citigroup started to increase its exposure to extremely risky subprime-related and other credit market assets in an effort to obtain higher asset yields.  By the end of 2007, Citigroup had become the largest U.S. subprime mortgage lender, the largest arranger of collateralized debt obligations ("CDOs"), the largest player in the global structured investment vehicle ("SIV") market, and the largest lender of highly leveraged loans among all investment banks.

5.      During the Relevant Period, Citigroup failed to disclose that it had billions of dollars in credit market exposure in the United States and by 2008, when it was forced to begin writing down its vast subprime and credit market exposures, it was simply too late.  Citigroup had already incurred billions of dollars in losses and was on the brink of bankruptcy, requiring the federal government to inject hundreds of billions of dollars of taxpayer money into the bank simply to keep it afloat.

6.      The Offering Documents used to sell the Euro Notes, and the SEC filings incorporated therein, were false and misleading as detailed herein.

### A.    Citigroup's Failure to Disclose Its CDO Exposure

7.      Throughout the Relevant Period, defendants caused Citigroup to misrepresent the nature of its involvement with subprime CDOs.  Defendants falsely portrayed Citigroup as a minor player in the fixed income market for CDOs and other subprime-related investments.  For instance, prior to November 4, 2007, Citigroup repeatedly represented that it had only "*limited continuing involvement*" with CDOs, and that "*securitizing these assets [accordingly] reduces the Company's credit exposure to borrowers*."  Citigroup's quarterly and annual filings with the SEC even

distinguished its "CDO-type transactions" from its "[m]ortgage-related transactions," falsely portraying its CDO involvement as benign and somehow distinct from its toxic subprime and Alt-A residential mortgage assets. *See* Citigroup Quarterly Report on Form 10-Q for the period ended June 30, 2007, at 42, 67. These statements were false and misleading, as Citigroup was the largest CDO issuer in the world, underwriting $34 billion in CDOs in 2006 and increasing that amount by almost 50% in 2007 to $49.3 billion.

8.      Citigroup also failed to disclose billions of dollars of CDO exposure. For example, in its 2006 Annual Report on Form 10-K and Reports on Form 10-Q for the periods ended March 31, 2007 and June 30, 2007, defendant Citigroup continued to misrepresent that its year-end subprime CDO exposure was limited to $26 billion, and had declined by almost 25% to $20 billion by the end of the first quarter of 2007, and by almost 50% to $13 billion by the end of the second quarter of 2007. These representations were false and misleading, as they vastly understated Citigroup's actual exposure by at least 50%. In fact, by November 2007, Citigroup failed to disclose more than $50 billion of Citigroup's subprime CDO exposure, which included, *inter alia*, the following undisclosed exposure:

(a)      ***Subprime-backed CDO Super Senior Tranches – $18.0 billion***. Beginning "***no later than mid-2006***,"[2] Citi was retaining super senior tranches of its own CDO securitizations. As noted by the U.S. Senate in the Final Report issued by the FCIC,[3] "Citigroup retained significant

---

[2]      *Securities and Exchange Commission v. Citigroup, Inc.*, 1:10-cv-01277-ESH (D.D.C.), Complaint at ¶11 [Dkt. 1].

[3]      The FCIC, or the Financial Crisis Inquiry Commission, was created by the U.S. Senate to "examine the causes, domestic and global, of the current financial and economic crisis in the United States." The FCIC was established as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the President in May 2009. The FCIC's statutory

exposure to potential losses on its CDO business . . . . While its competitors did the same, few did so as aggressively . . . ." *The Financial Crisis Inquiry Report* (January 2011) ("FCIC Report") at 196. As noted in an SEC complaint filed against Citigroup in 2010, Citigroup failed to disclose or excluded from its financial statements for the periods prior to the third quarter of 2007 these retained super senior CDO tranches – which totaled $18 billion during 2007 – when disclosing its purported subprime exposure during the Relevant Period.

(b)     ***Commercial Paper CDOs backed by Liquidity Puts – $25.0 billion***. By January 1, 2004, Citigroup was issuing CDOs with "liquidity puts," *i.e.*, insurance backed by Citigroup in the event of default, on CDOs that Citigroup securitized and sold. As noted by the SEC, this was "the economic equivalent of holding the super senior tranche [of the CDO]." Citigroup failed to disclose or excluded from its financial statements for the periods prior to the third quarter of 2007 its CDO exposure, which totaled $25 billion during 2007, when disclosing its purported subprime exposure during the Relevant Period. This $25 billion of CDO exposure was not disclosed until November 2007.

(c)     ***CDOs hedged by monoline insurers – $10.5 billion***. Citi also failed to disclose or excluded from its financial statements for the periods prior to the third quarter of 2007 its "hedged" CDO exposure, which totaled $10.5 billion during 2007, when making representations about its purported subprime exposure during the Relevant Period. Despite the notion that these CDOs were "hedged" by monoline insurers and other hedging counterparties, Citigroup failed to disclose that it remained exposed to significant losses which were ultimately realized. This $10.5 billion of CDO exposure was not disclosed until January 2008.

---

instructions called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government.

### B.     Citigroup Understated Its Loan Loss Reserves

9.     In its SEC filings throughout the Relevant Period, which were incorporated by reference into the Euro Notes Offering Documents, Citigroup misrepresented its overall financial health by failing to record adequate loan loss reserves on its subprime mortgage portfolio. While Citigroup purported to base its reserves on "***probable losses inherent in the portfolio***," in fact, Citigroup actually reserved only for those loans that had already defaulted, excluding those loans for which default was probable. In addition, rather than increasing its loan loss reserves in 2006 and 2007, as it was required to do because the quality of its loan portfolio had deteriorated significantly, Citigroup ***decreased*** its reserves. As a result, by year-end 2007, Citigroup was severely under-reserved for loan losses on more than $213 billion of poor quality residential mortgage loans.

### C.     Citigroup Misrepresented that It Was "Well Capitalized"

10.     From June 2006 through July 2008, Citigroup falsely reported its solvency and falsely claimed to be "well capitalized." For example, in its 2006 Annual Report on Form 10-K, Citigroup reported its Tier 1 capital ratio and described itself as "well capitalized." This representation was repeated in each annual and quarterly report thereafter throughout this two-year period, even though Citigroup's purported Tier 1 capital ratio failed to include billions of dollars of subprime exposure. Even after Citigroup disclosed its subprime exposure in November 2007, it continued to falsely represent that it was "well capitalized" by failing to properly value its subprime assets, as detailed below at ¶¶104-112. Moreover, Citigroup continued to claim that it was "well capitalized" even as it was secretly borrowing as much as $100 billion from the Federal Reserve in 2008 and early 2009. At its peak, this borrowing exceeded the Company's market capitalization by an astonishing 1,300%. Indeed, less than a month before Citi received a record $326 billion in emergency federal support in November 2008, Citigroup was continuing to falsely represent that it was "well capitalized."

### D.     Citigroup Misrepresented Assets Contained in Its Structured Investment Vehicles

11.     Defendants misrepresented the nature and quality of Citigroup's assets in seven off-balance-sheet SIVs that Citigroup had sponsored and managed. At their peak they collectively owned as much as $100 billion in assets, including subprime-backed RMBS, CDOs and CMBS, but these assets were omitted from Citigroup's balance sheet until November 2007. In fact, as noted by the FCIC, "*More than other banks, Citigroup held assets off of its balance sheet, in part to hold down capital requirements.*" When the SIVs were consolidated, defendants again failed to disclose the inherent risks to Citigroup of the toxic assets held by the SIVs. In fact, Citigroup misrepresented the quality of the SIV assets in its third quarter 2007 Report on Form 10-Q, filed November 5, 2007, and incorporated by reference in certain of the Euro Notes Offering Documents (¶¶74-76) (and similarly in its December 14, 2007 Form 8-K), in which Citigroup stated that it only had "*high quality asset* portfolios" and misrepresented it had "*no direct exposure to U.S. subprime assets.*" Those SIV assets did include low quality, highly risky subprime assets. The risks associated with and the impaired value of these assets were so significant that on November 19, 2008, less than a year after consolidating the SIVs on the Company's balance sheet, Citigroup paid *$17.4 billion* to wind them down.

### E.     GAAP Violations

12.     In a similar fashion to the misstatements identified above, Citigroup's Relevant Period financial statements, incorporated by reference into the Euro Notes Offering Documents, violated GAAP and SEC disclosure rules for at least the following reasons:

- Citigroup failed to disclose that it had direct exposure to approximately $66 billion of CDO exposure *in violation of Statement of Financial Accounting Standards ("SFAS") 107*;

- Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FASB Interpretation No. ("FIN") 46(R)*;

- Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SEC Staff Accounting Bulletin ("SAB") 102, SFAS 5 and SFAS 114*; and

- Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*.

The misrepresentations, omissions and GAAP violations referred to above involved the same subprime and credit market exposures that ultimately led Citigroup to record *$58 billion of losses*,[4] receive two separate capital infusions totaling *$45 billion* from the U.S. Treasury, and take *$300 billion* in emergency insurance from the FDIC for its most toxic assets and more than *$100 billion* in secret emergency lending from the Fed just to avoid bankruptcy – *by far the largest bank bailout in U.S. history*.

13.     Beginning in late 2007/early 2008, as facts about Citigroup began to leak out to investors in piecemeal fashion, defendants admitted to more than $50 billion of undisclosed subprime exposure. However, defendants continued to misrepresent the scope of Citigroup's exposure risk. For example, when defendants disclosed on November 4, 2007, that Citigroup had exposure to so-called "super-senior" tranches of CDOs of $43 billion, they failed to accurately disclose Citi's CDO and subprime-related exposure. It was not until late 2008 and early 2009 that investors were able to begin to comprehend the full extent of the Company's exposure to subprime and other toxic assets.

14.     By misrepresenting Citigroup's true financial condition, including its balance sheet exposure to CDOs and other toxic subprime assets, and therefore its true capitalization and ability to generate future cash flows – indeed, its ability to remain solvent – starting on October 12, 2005, Citigroup was able to tap the European capital markets far more cheaply than it would have been

---

[4]     FCIC Report at 261.

able to (if at all) at the expense of plaintiff and members of the proposed Class (as defined below). Had investors known the truth about Citigroup's balance sheet and operations, they would have required a much greater discount to face (or higher coupon payments) to compensate investors for the enormous risks they were taking in purchasing Euro Notes. While plaintiff and other Euro Notes investors were in fact buying what amounted to non-investment grade junk bonds, they were paying investment-grade prices.

15.     The 26 Euro Notes that are the subject of this action had an aggregate face value of approximately $30 billion, and include the following:

**Oct. 12, 2005 Programme for the Issuance of Euro Medium-Term Notes, Series B**

| **Final Terms dated:** | **Amount:** |
|---|---|
| 10/31/05 | £500,000,000 |
| 11/28/05 | €800,000,000 |
| 03/02/06 | £500,000,000 |
| 03/27/06 | €750,000,000 |
| 04/03/06 | Fr.300,000,000 |
| 05/18/06 | €1,800,000,000 |
| 06/13/06 | £400,000,000 |
| 06/26/06 | €1,000,000,000 |
| 08/09/06 | £500,000,000 |
| 09/27/06 | Fr.300,000,000 |
| 10/06/06 | €1,250,000,000 |

**Oct. 12, 2006 Programme for the Issuance of Euro Medium-Term Notes, Series B**

| | |
|---|---|
| 10/31/06 | €500,000,000 |
| 11/29/06 | Fr.250,000,000 |
| 12/08/06 | €1,500,000,000 |
| 01/15/07 | £600,000,000 |
| 01/29/07 | €1,500,000,000 |
| 03/01/07 | €1,750,000,000 |
| 03/19/07 | Fr.250,000,000 |
| 05/29/07 | DK2,000,000,000 |
| 05/30/07 | €1,250,000,000 |
| 06/05/07 | Fr.250,000,000 |

**Oct. 2, 2007 Programme for the Issuance of Euro Medium-Term Notes, Series B**

- 03/04/08    €100,000,000
- 03/25/08    €2,000,000,000
- 04/01/08    £500,000,000
- 06/24/08    £800,000,000
- 08/05/08    €45,000,000

16.     As investors learned in early 2009 that Citigroup was essentially insolvent, the Euro Notes lost approximately $9 billion in value, or approximately 30%.

17.     As Citigroup's misrepresentations came to light, Citigroup became the focus of governmental investigations and enforcement actions, as well as civil suits. For example, on July 29, 2010, the SEC filed a securities fraud complaint under §17 of the Securities Act of 1933 against Citigroup and two executives related to Citigroup's undisclosed CDO exposure. Citigroup agreed to pay a $75 million civil penalty, and the executives agreed to pay additional penalties. The FCIC learned in 2010 that Citigroup was aware of the deteriorating condition of its loan portfolio as early as 2006, noting that the loans "did not meet Citigroup's loan guidelines and thus endangered the Company." Citigroup's chief underwriter for Correspondent Lending, Richard Bowen, testified that in 2006, an astonishing *60% of the prime loans purchased by Citigroup for sale to other investors were defective*. *The number rose to 80% in 2007*. Citigroup's subprime mortgages were in even worse shape. Indeed, Bowen communicated these facts in 2007 directly to defendant Robert E. Rubin, former United States Treasury Secretary and Citigroup director, with an email that read "URGENT – READ IMMEDIATELY."

### III.    JURISDICTION AND VENUE

18.     Defendant Citigroup is a Delaware corporation with its principal place of business in this District at 399 Park Avenue, New York, New York 10022, and is thus a citizen of both Delaware and New York.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a), because the amount in controversy exceeds $75,000, and the plaintiff is a citizen of the United Kingdom while the defendants are citizens of states other than the United Kingdom.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c). Citigroup is headquartered in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts and drafting of regulatory filings made with the SEC, occurred in this District.

## IV.    PARTIES

### A.    Plaintiff

21.     Rentokil-Initial Pension Scheme is the employee pension scheme for Rentokil Initial plc ("Rentokil"). Rentokil employs over 68,000 people and is a publicly traded United Kingdom business-services firm organized to deliver services by local people in over 50 countries around the world. During the Relevant Period, plaintiff purchased the Euro Notes and was damaged as a result thereof.

### B.    Defendants

22.     Defendant Citigroup is a multinational financial services company based in New York, New York, and incorporated in Delaware. It was formed in 1998 through the merger of Citicorp and Travelers Group. At its peak, Citigroup was the largest bank in the world by assets, although it had lost this position by 2008. Citigroup's stock is traded on the New York Stock Exchange under the ticker symbol "C." Citigroup prepares periodic filings in New York and files them with the SEC in Washington, D.C. Citigroup is a citizen of Delaware and New York.

23.     Defendant Sanford I. Weill ("Weill") was Chairman of the Board of Directors at Citigroup during the Relevant Period until April 18, 2006, when he was replaced by defendant

Charles O. Prince, III. Weill is a citizen of the United States and resident of New York and Connecticut.

24.     Defendant Charles O. Prince, III ("Prince") was a Citigroup (or predecessor company) employee since 1979. He served as Chief Executive Officer ("CEO") of Citigroup from 2003 and Chairman of the Board of Directors from April 2006 until he was forced to resign on November 4, 2007. He retired from employment with Citigroup effective December 31, 2007. Prince is a citizen of the United States and resident of New York and Florida.

25.     Defendant Robert E. Rubin ("Rubin") was a director of Citigroup and Chairman of the Executive Committee from 1999 through January 9, 2009. Following defendant Prince's departure, Rubin was named interim Chairman of the Board of Directors. Rubin is a citizen of the United States and resident of New York.

26.     Defendant Vikram Pandit ("Pandit") has been a member of the Citigroup Board of Directors since 2007, and became CEO in December 2007. Pandit is a citizen of the United States and resident of New York and Connecticut.

27.     The SEC filings incorporated by reference into the Euro Notes Offering Documents and identified below in ¶¶113-145 were prepared and approved at Citigroup headquarters in New York, New York.

## V.     BACKGROUND

28.     Citigroup operates as a New York-based multibank holding financial services company that provides various financial services to customers around the globe. The Company's Global Consumer segment offers banking, lending, insurance, and investment services. Citigroup's Markets and Banking segment provides various investment and commercial banking services and products.

### A.     Residential Mortgage Loan Categories

29.     Borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator.  The loan originator assesses a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score.  Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process, as well as higher LTVs (loan-to-value ratios).  Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the rate of the loan to issue, the amount of the loan, and the general structure of the loan.

30.     A loan originator issues a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health.  Borrowers who are issued "prime" mortgage loans are deemed to be the most creditworthy and receive the best rates and structure on mortgage loans.

31.     If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator issues the borrower a loan referred to as a "low-doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan, and the general structure of the loan will not be as favorable as it would be for a prime borrower.  While borrowers of "low-doc" or Alt-A loans typically have clean credit histories, the risk profile of the "low-doc" or Alt-A loan increases because of, among other things, higher LTVs, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

32.     A borrower will be classified as "subprime" if the borrower has a lower credit score and higher debt-to-equity ratio.  Borrowers that have low credit ratings are unable to obtain a

- 12 -

conventional mortgage because they have a higher-than-average risk of defaulting on a loan. For this reason, lending institutions often charge interest on subprime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

**B.      Subprime Loans and the Secondary Market**

33.      Over the past 30 years, the subprime mortgage market has evolved from constituting a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of subprime loans annually. While several important legislative and regulatory changes have induced such growth, the subprime mortgage market could not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

34.      During the 1980s, credit rating agencies began rating privately issued mortgage-backed securities ("MBS"), which made them more suitable to a wider range of investors and expanded the market for MBS. By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

35.      This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess a large deposit base in order to maintain their liquidity. As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

36.      During the 1990s, the demand for mortgage loans continued to increase. To spur continued sales of mortgages, lenders became amenable to originating subprime mortgages. This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for subprime mortgage loans. By 1998, approximately $150 billion in subprime mortgage loans were originated, up more than 400% from four years earlier.

37.     The growth in the subprime mortgage loan market during the 1990s was also aided by mechanisms that allocated risk in subprime MBS. These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part, of their MBS, despite the higher risk on the subprime mortgages upon which the MBS were based.

38.     As a result of these credit enhancement mechanisms, MBS were able to be marketed to a wider investor audience, and the value of subprime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997. These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the subprime mortgage lending, with ample liquidity to originate new subprime loans. By 2005, subprime mortgage loans were being originated at a rate of over $620 billion annually.

### C.     The Secondary Market

39.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan. The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

40.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution. By

selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby obtains capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into MBS. In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

41.     According to *The Wall Street Journal*, as illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: *The Wall Street Journal*)

42.     In this MBS structure, the senior tranches received the highest investment rating by the credit rating agencies, usually AAA. After the senior tranches, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

43.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches. This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages. The following *Wall Street Journal* diagram illustrates the concept of tranches within an

MBS comprised of residential mortgages (often referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

44.     As illustrated below, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor," (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the MBS, (4) the entity or trust responsible for issuing the MBS, often called the "trust," and (5) the investors in the MBS.

45.     The securitization process begins with the sale of mortgage loans by the sponsor—the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



46.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**D.      Citigroup's Involvement in Mortgage-Related Activities**

47.     Citigroup was an active and major participant in both the mortgage origination and securitization industries during the Relevant Period, and its eventual losses were a direct result of its origination and securitization activities on both fronts.

48.     Prior to and during the Relevant Period, Citigroup expanded its subprime lending, both through direct originations and through purchases from third parties known as "correspondent" lenders. *By 2006, Citigroup was the fourth-largest mortgage originator, with $132.9 billion in loan*

*originations in the first nine months of that year, and by the end of 2007, Citigroup's portfolio grew to $150 billion.*

49.     By expanding its loan originations, Citigroup generated a pool of mortgages it could then bundle into RMBS, which it could then bundle into CDOs, both of which were then often sold to Company-sponsored SIVs. Thus, the same loans became a source turbocharging Citigroup's required revenue and earnings growth by generating revenue multiple times, and fueled Citigroup's growth in both its lending and banking businesses.

### E.     Citigroup's CDOs

50.     Citigroup was heavily involved in the CDO market.  By 2006, Citigroup was the second-largest mortgage CDO underwriter, issuing $34 billion of such securities in a single year.  In 2007, Citigroup became the world's largest underwriter of mortgage CDOs, issuing $49.3 billion of such securities, more than rivals Merrill Lynch and Deutsche Bank.  In addition to underwriting and holding cash CDOs, Citigroup was also the world's third-largest arranger of synthetic mezzanine asset-backed securities ("ABS") CDOs from 2004 to 2007.  Thus, defendants had direct knowledge, understanding and unparalleled insight into the true underlying risks of the CDO market during the Relevant Period.  Even while the subprime market was collapsing around them, defendants failed to disclose the extent of Citigroup's exposure to CDOs and other toxic assets from investors.

51.     Citigroup created its CDOs based on assumptions regarding three key factors: (i) the risk of default of the underlying asset (*i.e.*, each RMBS tranche being included in the CDO); (ii) the severity of any likely loss; and (iii) the degree of correlation between the underlying assets, *i.e.*, the degree to which the risk of default among the RMBS was related and not independent.  Despite Citigroup's leading position and clear expertise in the CDO market, the assumptions utilized by Citigroup regarding these three factors failed to reflect changing market conditions, including the risk of default and likely losses.  For example, Citigroup's model assumed that housing prices would

continue to rise by 6% each year – in perpetuity. When prices leveled off and started to decline, the foundation of the Company's model crumbled, as both the risk of default and severity of default increased dramatically.

52.     Citigroup did not just underwrite billions of dollars of CDOs, Citigroup retained billions of dollars of CDOs – most of which were not disclosed on Citigroup's books. As discussed herein, Citigroup also wrote liquidity puts on $25 billion of commercial paper CDOs, thus retaining a variable interest in tens of billions of dollars of exposure to CDOs. These massive exposures were not disclosed to investors until at least the end of 2007, and even then were not accurately valued on Citigroup's balance sheet until well into 2008, as discussed below.

    **F.     Citigroup's SIVs**

53.     Citigroup also created highly risky off-balance-sheet special purpose entities called SIVs, which the Company invented in 1988. SIVs are essentially investment companies which generate investment returns by borrowing money at low interest rates in the short- and medium-term commercial paper market, and investing that money in long-term fixed income instruments, such as MBS and credit card debt, which typically pay higher interest rates. These SIVs also invest in CDOs and other mortgage-related securities. All of these instruments rely on the underlying soundness of the long-term securities upon which their value is ultimately based. Citigroup received hundreds of millions of dollars in fees in connection with the creation and management of these SIVs.

54.     SIVs are subject to a number of risks, including the risk associated with their underlying investments. In particular, because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, SIVs are subject to significant "liquidity risk." Because SIVs constantly re-borrow in the short-term commercial paper market, the SIVs always face the risk that they will not be able to re-borrow if lenders in the commercial paper market withdraw. In that event, the SIVs would no longer be able to hold their long-term assets and would be required

to sell them. If there were no demand for those assets, the SIVs could be forced to sell those assets at depressed prices.

55.     In addition to managing the SIVs, Citigroup was at all relevant times hereto committed to providing a liquidity back-stop to its affiliated SIVs in the event they failed or otherwise became insolvent. The true extent of these commitments was not disclosed by defendants. Because of Citigroup's commitments to its affiliated SIVs, Citigroup was forced to consolidate these entities' financial results on its financial statements starting in November 2007.

56.     On November 19, 2008, Citigroup disclosed that the SIVs were so impaired that it could not find a buyer. Citigroup paid *$17.4 billion* to wind down the SIVs and bring the assets onto its balance sheet. Simultaneously, the assets were written down by another *$1.1 billion*.

## VI.     CITIGROUP'S EURO NOTE SECURITIES OFFERINGS

57.     The 26 Euro Notes in this action were issued pursuant to three different Euro Note Programmes, the Base Prospectuses for which incorporated by reference a number of different materially misleading SEC filings, as detailed in Appendix A hereto.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE IN THE OFFERING DOCUMENTS

### A.     False and Misleading Statements Regarding Citigroup's CDO Exposure

58.     Throughout the Relevant Period, defendants repeatedly misrepresented Citigroup's massive CDO exposure, including its super senior tranches of subprime-backed CDOs, liquidity puts on commercial paper CDOs and exposure to monoline insurers. Citigroup's statements in its Forms 10-K and 10-Q described below, which were incorporated by reference in its Base Prospectuses, regarding its exposure to subprime-backed CDOs and its off-balance-sheet variable interest entities ("VIEs") that contained CDOs were materially false and misleading as they grossly understated

and/or failed to disclose the true extent of Citigroup's massive CDO holdings and the guarantees it provided to certain counter-parties who purchased Citigroup's CDOs ("liquidity puts").

59.     For example, in Citigroup's 2004 Form 10-K, Citigroup stated:

Variable Interest Entities

\*       \*       \*

In addition to the VIEs that are consolidated in accordance with FIN 46-R, *the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary*. These include multiseller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.

\*       \*       \*

[T]he total assets of unconsolidated VIEs where the Company has significant involvement is \$145.9 billion and \$116.6 billion at December 31, 2004 and December 31, 2003, respectively, including *\$17.7 billion and \$7.9 billion in investment-related transactions*, \$2.0 billion and \$6.0 billion in mortgage-related-transactions, \$17.6 billion and \$8.5 billion in CDO-type transactions, \$6.4 billion and \$0.2 billion in trust preferred securities, and \$102.0 billion and \$94.2 billion in structured finance and other transactions.

60.     The same, or nearly identical, statements were repeated in all subsequent reports on Forms 10-K and 10-Q filed with the SEC through the second quarter of 2007.

61.     In addition, in its 2006 Annual Report on Form 10-K, filed with the SEC on February 23, 2007, and in various offering statements prior to November 4, 2007, Citigroup represented that its VIEs (which included CDOs) were "*primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of securities issued by the trust.*"

62.     In its second quarter 2007 10-Q, filed with the SEC on August 3, 2007, Citigroup represented that it had only "*limited involvement*" with CDOs and that "*securitizing these assets [accordingly] reduces the Company's credit exposure to borrowers*." Citigroup's SEC filings also falsely distinguished its "CDO-type transactions" from its "mortgage-related transactions."

63.     These statements were materially false or misleading at the time they were made. The true facts which then existed were as follows:

(a)     Citigroup held approximately $18 billion in super senior CDO exposure in 2007.

(b)     As a result of the "liquidity puts," at least $25 billion of Citigroup's subprime-backed CDOs were **not** "non-recourse" and certainly qualified as VIEs, as, pursuant to the terms of those liquidity puts, Citigroup guaranteed $25 billion of CDOs in the event of default.

(c)     Citigroup held approximately $10.5 billion worth of CDOs backed by monoline insurers who were exposed to billions of dollars worth of CDOs and RMBS for which they could not pay.

(d)     Citigroup had nearly $66 billion in direct exposure to subprime-backed CDOs that put the entire Company at risk.

64.     In addition, defendants' failure to disclose Citigroup's CDO exposure violated GAAP and rendered each of its financial statements issued during the Relevant Period and incorporated into Citigroup's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q false and misleading, as detailed below at ¶¶80-85.

## B.     False and Misleading Statements Regarding Allowance for Loan Losses and Stated Reserves

65.     During the Relevant Period, Citigroup held a significant portfolio of poor quality residential home loans, which by year-end 2007 totaled approximately $213 billion.

66.     Citigroup's 2004 Report on Form 10-K, 2005 Report on Form 10-K, 2006 Report on Form 10-K, and 2007 Report on Form 10-K each contained the following statement concerning Citigroup's "Allowance for Loan Losses":

> For [c]onsumer [loans], . . . each portfolio of smaller-balance, homogeneous loans –
> including consumer mortgage, installment, revolving credit, and most other

- 22 -

consumer loans – is collectively evaluated for impairment. *The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions.*

67.     This statement was materially false and misleading when issued and incorporated into the Offering Documents.  The true facts which then existed were as follows:

(a)     Citigroup did not follow its stated method for calculating "Allowance for Loan Losses."  Instead, Citigroup: (i) ignored recent trends such as downturns in the housing market in mid-2005, and (ii) failed to properly evaluate "probable losses inherent in the portfolio." Citigroup calculated its reserves based solely on assets that had already defaulted, excluding those loans in which a default had not yet occurred but was nevertheless probable.  Thus, Citigroup's reported loan loss reserves were materially false and misleading, and provided an inaccurate picture of Citigroup's financial health.

(b)     As Citigroup significantly increased its portfolio of risky subprime home loans between 2005 and 2007, and while GAAP and the relevant 2005 and 2006 housing market indices dictated that Citigroup *increase* its loan loss reserves, Citigroup substantially *decreased* them in 2005, 2006 and 2007, giving the market the impression that Citigroup's exposure to loan defaults was far lower than it actually was.  In fact, by year-end 2006, Citigroup had decreased its loan loss reserves to just half the amount it recorded in 2003, a time when Citigroup's loans were less risky.

(c)     Prior to the Relevant Period, Citigroup had amassed approximately $213 billion of poor quality residential mortgage loans, a large portion of which defaulted.  Although these loans were of poor quality and the housing market had collapsed, Citigroup continued to understate its loan loss reserves.  Well after the housing market collapsed, Citigroup finally increased its loan loss reserves at year-end 2007 to 2.07%, still well below its 2003 reserve of 2.64%.

However, even at a 3% reserve level – which still would have been inadequate – the Company's loss reserves would have been understated by $7.2 billion at year-end 2007, $4.3 billion at the first quarter of 2008, and $1.6 billion at the second quarter of 2008.

(d)     Citigroup's Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group, Richard Bowen, testified on April 7, 2010 before the FCIC, admitting that by June 2006, more than 60% of the $50 billion of *prime* mortgages purchased by Citigroup and sold to other investors (including Fannie Mae and Freddie Mac) were defective, notwithstanding the fact that representations and warranties to the contrary were made. Mr. Bowen also testified that by 2006, Citigroup's Chief Risk Officer had started reversing large numbers of underwriting decisions, approving mortgages that did not meet Citigroup guidelines. Mr. Bowen testified that defective prime mortgages, purchased by Citigroup and sold to other investors, increased to an astonishing 80% during 2007. Mr. Bowen further testified that he had issued warnings to senior management at all levels of Citigroup's Consumer Lending Group. Nevertheless, at the same time Citigroup's lending standards were rapidly deteriorating, Citigroup was actually *decreasing* its loan loss reserves. For example, on June 30, 2006, *after* Mr. Bowen discovered Citigroup's mortgage problems, Citigroup decreased its loan loss reserves by almost 10% from 1.57% to 1.44%. The following quarter, Citigroup decreased its reserves yet again by another 5%, to 1.37%. And, in the beginning of 2007, with the credit crisis in full swing, Citigroup yet again decreased loan loss reserves to 1.32%. Mr. Bowen informed senior management in 2006 and 2007 that Citigroup's increasing risk in its prime and subprime mortgage business presented grave risk to Citigroup's shareholders. On November 3, 2007, Bowen emailed defendant Rubin and Citigroup's CFO that the problem had gotten out of control, writing "URGENT – READ IMMEDIATELY" in the subject line. He identified "breakdowns of internal controls" and "significant but possibly unrecognized

financial losses existing within our organization." Despite these clear warnings, Citigroup failed to materially increase its loan loss reserves.

(e)     Defendants were aware of market conditions that severely increased the risks Citigroup bore concerning its exposure to the subprime residential real estate market. By the third quarter of 2005, and accelerating into 2006, the domestic housing market had plateaued and was in a decline, and this collapse of the housing market had immediately resulted in rising delinquency rates and impaired loans.

68.     By failing to follow GAAP, Citigroup materially understated its loan loss reserves and overstated its earnings during the Relevant Period, as detailed below, in the financial statements contained in each of its quarterly reports on Form 10-Q prepared and disseminated from New York City, for the quarters ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008, and in its Annual Reports on Form 10-K for 2006 and 2007.

## C.     False and Misleading Statements Regarding Citigroup Being "Well Capitalized"

69.     Each of Citigroup's Reports on Form 10-K and Form 10-Q, filed from June 2006 through July 2008, and incorporated by reference in the Euro Notes Offering Documents, contained a discussion of Citigroup's Tier 1 capital ratio and stated that based on Citigroup's balance sheet, it was "well capitalized." The fundamental measure of financial viability for a financial firm like Citigroup is the Tier 1 capital ratio, which measures the Company's readily available capital as a percentage of assets that were potentially at risk of default (known as its "Risk-Adjusted Assets"). If the Company had timely disclosed the large amounts of risky subprime exposure and had properly valued that exposure, even after disclosing it, Citigroup's actual Tier I capital ratio would have been

- 25 –

materially lower than what Citigroup reported, and Euro Notes purchasers would have correctly concluded that the Company lacked sufficient capital to fund its potential losses.

70.     In each of its SEC filings between June 2006 and July 2008, Citigroup represented that it maintained a "well-capitalized" position.

(a)     The second quarter 2006 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 8.51% at June 30, 2006;

(b)     The third quarter 2006 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 8.64% at September 30, 2006;

(c)     The 2006 Report on Form 10-K states that Citigroup had maintained its "well-capitalized" position with a Tier 1 capital ratio of 8.59% at December 31, 2006;

(d)     The first quarter 2007 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 8.26% at March 30, 2007;

(e)     The second quarter 2007 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 7.91% at June 30, 2007;

(f)     The third quarter 2007 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 7.32% at September 30, 2007;

(g)     The 2007 Report on Form 10-K states that Citigroup had maintained its "well-capitalized" position with a Tier 1 capital ratio of 7.12% at December 31, 2007; and

(h)     The first quarter 2008 10-Q states that Citigroup is "well capitalized" with a Tier 1 capital ratio of 7.74% as of March 30, 2008.

(i)     Citigroup continued to make similar false statements in its Form 10-Qs throughout 2008 during the height of the credit crisis, while receiving emergency government aid. Indeed, Citigroup continued to make these materially false and misleading statements less than a month

prior to the $326 billion government bailout at the end of November 2008, stating in its Report on Form 10-Q for the third quarter of 2008, filed on October 31, 2008, that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 8.19% at September 30, 2008."

71.     Each of the statements made by Citigroup in ¶¶69-70 above were materially false and misleading, as Citigroup was not well capitalized during the period June 30, 2006 to July 2008. The true facts which then existed were as follows:

(a)     Citigroup's Tier 1 capital ratio was calculated during the period up to November 2007 without including its direct exposure to CDOs backed by subprime mortgages, which by the third quarter of 2007 had reached $66 billion. This exposure was more than 3.3 times the capital cushion the Company relied on for its purportedly "well-capitalized" status. Thus, the disclosed Tier 1 capital ratios reported during this period were false and misleading and failed to reflect Citigroup's actual financial condition and risks.

(b)     Even after disclosing its massive CDO exposure in November 2007, Citigroup's statements that it was "well capitalized" were false and misleading because Citigroup failed to properly value its subprime-related assets beginning in 2006, as detailed below at ¶¶104-112, which write-downs, if properly and timely recorded, would have materially reduced Citigroup's Tier 1 capital ratio. These assets became increasingly impaired throughout 2006, 2007 and 2008, and on November 17, 2008, Citigroup announced that it would cease valuing $80 billion of these assets, including CDOs, at their market price each reporting period by removing these assets from the trading portfolio and reclassifying them as "held to maturity," "held for sale," or "held for investment." This announcement occurred a mere six days prior to requiring a world-record $326 billion government bailout to prevent its collapse. This demonstrated that Citigroup was not

"well capitalized" and lacked the capital to absorb the changes to its financial position that would occur if Citigroup had properly marked those assets to their fair value.

        (c)     Throughout the Relevant Period, Citigroup understated its loan loss reserves, as detailed in ¶¶92-103, by only including past defaults and not accounting for reasonably anticipated defaults, which if properly calculated would have materially reduced its Tier 1 capital ratio.

      72.     The depth of Citigroup's lack of capital during 2007 and 2008 is further underscored by the fact that Citigroup received more than $100 billion in emergency lending from the Federal Reserve (in addition to the $45 billion bailout from the U.S. Treasury) beginning in early 2008 and continuing well into 2009. *See* Bradley Keoun and Phil Kuntz, *Wall Street Aristocracy Got $1.2 Trillion in Secret Loans*, Bloomberg.com, Aug. 22, 2011.

      73.     At their peak, these emergency loans in the aggregate exceeded 1,300% of the market value of Citigroup, but were never disclosed to the market, including Euro Notes purchasers, during the Relevant Period, nor accurately reflected in Citigroup's balance sheet as required by GAAP.

      **D.**     **False and Misleading Statements Regarding the Quality of SIV Assets**

      74.     Up until December 2007, Citigroup failed to properly disclose seven SIVs on its balance sheet, which assets included RMBS, CDOs and CMBS. Even after Citigroup was forced to consolidate these SIV assets onto its balance sheet in December 2007, it continued to misrepresent the nature and quality of these assets. In fact, Citigroup's second quarter 2008 Form 10-Q falsely reported an *increase* in the value of $49 billion in SIV assets.

      75.     In addition, Citigroup's third quarter 2007 Form 10-Q, filed November 5, 2007 with the SEC (and similarly its December 14, 2007 Form 8-K), represented that the SIV assets *only had "high quality asset portfolios"* and *"no direct exposure to U.S. subprime assets."*

76.     The statements in ¶¶74-75 above were false and misleading at the time they were made. The true facts which then existed were as follows:

(a)     The SIV assets omitted from Citigroup's balance sheet had 40% exposure to structured finance ($23.4 billion) and included $4 billion of toxic RMBS and other risky and impaired subprime-backed assets, and therefore were not "high quality."

(b)     By the third quarter of 2007, the market for the SIV assets was illiquid, which required Citigroup to fund the SIVs itself.

(c)     By March 2008, the value of the SIV assets was so impaired that Citigroup was forced to unwind them and compensate the holders of the SIVs' commercial paper to the tune of almost $20 billion.

### E.     Citigroup's False Financial Statements

77.     As described herein, Citigroup's Relevant Period financial statements, incorporated by reference into the Euro Notes Offering Documents, violated GAAP and SEC disclosure rules for at least the following reasons:

- Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*.

- Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*.

- Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*.

- Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*.

78.     The above GAAP violations were material misstatements as contemplated under SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99"). In SAB 99, the SEC makes clear that any determination of materiality hinges on both qualitative and quantitative factors. The SEC notes

that "*exclusive reliance on . . . any percentage or numerical threshold has no basis in the accounting literature or the law.*"[5]

79.     Each of Citigroup's false and misleading statements described above was quantitatively and qualitatively material both in isolation and certainly when taken together with other false and misleading statements.  For example, Citigroup's SIVs at their peak had assets in excess of $100 billion, which approached 5% of Citigroup's entire balance sheet, and roughly approximated Citigroup's *entire capital base*.  The subprime exposure that Citigroup failed to disclose exceeded $50 billion.  When the risk inherent in these exposures finally materialized, Citigroup recorded *$58 billion of losses,*[6] needed a *$45 billion* infusion from the U.S. Treasury, and accepted *$300 billion* in emergency insurance from the FDIC for its most toxic assets and required more than *$100 billion* in secret emergency lending from the Fed just to avoid bankruptcy.  By any measure, therefore, the GAAP violations pertaining to these exposures were important to a reasonable investor, and thus material.

### 1.     Citigroup Failed to Disclose that It Had Direct Exposure to as Much as $66 billion of CDOs in Violation of SFAS 107

80.     During the Relevant Period, Citigroup had direct exposure to as much as $66 billion of CDOs, including undisclosed exposures to $25 billion of CDOs backed by liquidity puts, $18 billion of super senior CDOs (of which $8.5 billion were low quality mezzanine CDOs) and

---

[5]     Instead, SAB 99 cites to the concept of materiality from Statement of Financial Accounting Concepts No. 2: "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

[6]     FCIC Report at 261.

$10.5 billion of CDOs backed by monoline insurers. By failing to disclose these CDO exposures, Citigroup's financial statements were not prepared in accordance with GAAP.

81.     Specifically, Citigroup's CDO exposures were required to be disclosed in accordance with Statement of Financial Accounting Standards No. 107, *Disclosures about Fair Value of Financial Instruments* ("SFAS 107"). SFAS 107 required Citigroup to disclose "all significant concentrations of credit risk from *all* financial instruments." Citigroup's CDOs were, without question, financial instruments involving concentrations of high-risk subprime mortgage loans. As a result, SFAS 107 further required Citigroup to disclose:

> The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity . . . .

82.     The purpose behind these GAAP disclosure requirements is to warn investors about financial instruments with high concentrations of credit risk that *may* result in losses under changed conditions – not to wait until those losses become substantial and disclose the financial instruments *after* the losses are already harming investors.

83.     *Citigroup's super senior CDOs were required to be disclosed*. As noted in the SEC's complaint, Citigroup excluded from its financial statements for the periods prior to the third quarter of 2007 its super senior CDO exposure, which totaled $18 billion during 2007, when disclosing its overall subprime exposure to investors. Citigroup began retaining these super senior tranches from its own CDO securitizations "*no later than mid-2006*."[7] As noted in the FCIC Report, "Citigroup retained significant exposure to potential losses on its CDO business . . . . While

---

[7]     *Securities and Exchange Commission v. Citigroup, Inc.*, No. 1:10-cv-01277-ESH (D.D.C.), Complaint, ¶11 [Dkt. No. 1].

- 31 -

its competitors did the same, few did so as aggressively or, ultimately, with such losses." FCIC Report at 196. This $18 billion of CDO exposure was not disclosed until November 2007.

84.     ***Citigroup's commercial paper CDOs backed by liquidity puts were required to be disclosed.*** As noted in the SEC complaint, Citigroup also excluded from its financial statements for the periods prior to the third quarter of 2007 its CDOs backed by liquidity puts, which totaled $25 billion during 2007, when disclosing its overall subprime exposure to investors. This $25 billion of CDO exposure was not disclosed until November 2007.

85.     ***Citigroup's CDOs backed by monoline insurers were required to be disclosed.*** Citigroup also failed to disclose in its financial statements for the periods prior to the fourth quarter of 2007 $10.5 billion worth of super-senior CDOs that were purportedly "hedged" by monoline insurers and other hedging counterparties. Despite the notion that these CDOs were "hedged," they still exposed Citigroup to significant losses which were ultimately realized. By early 2007, it was clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, were overexposed to billions of dollars worth of CDOs and RMBS for which they could not pay.[8] This $10.5 billion of CDO exposure was not disclosed until January 2008.

---

[8]     For example, on March 14, 2007, *The Wall Street Journal* reported that "[t]raders also were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults." Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of CDOs and RMBS.

## 2.      Citigroup Failed to Consolidate or Disclose Off-Balance-Sheet Liquidity Puts in Violation of FIN 46(R)

86.      As noted by the FCIC Report, "***More than other banks, Citigroup held assets off of its balance sheet,*** in part to hold down capital requirements."  In the case of Citigroup's liquidity puts on commercial paper CDOs, the off-balance-sheet treatment was in clear violation of GAAP, specifically FASB Interpretation No. 46 (revised December 2003), *Consolidation of Variable Interest Entities* ("FIN 46(R)").

87.      Citigroup's liquidity puts (on commercial paper CDOs) were VIEs subject to the consolidation rules of FIN 46(R).  As noted above, FIN 46(R)-5 states that an implicit variable interest is "an ***implicit agreement*** to replace impaired assets held by a variable interest entity that ***protects holders of other interests in the entity from suffering losses.***"  As described herein, the liquidity puts on Citigroup's commercial paper CDOs amounted to this type of ***implicit agreement –*** a fact Citigroup eventually admitted in its 2007 Form 10-K.

88.      During 2004, 2005 and 2006, Citigroup issued $25 billion of commercial paper CDOs with a "liquidity put" feature that bound Citigroup to provide liquidity if any of those CDOs' values declined and the CDO could not refinance its maturing debt.  In other words, Citigroup was bound to buy back these instruments precisely when they might be losing value.  FASB Interpretation No. 46, ¶B10, clearly states that "written put options . . . are variable interests if they protect holders of other interests from suffering losses."  And, "[t]o the extent the . . . written put options . . . will be called on to perform in the event expected losses occur, those arrangements are variable interests."

89.      Citigroup failed to publicly disclose these liquidity puts until November 2007. During an analyst call on November 5, 2007, Citigroup disclosed the liquidity puts for the first time. Citigroup's CFO, Gary Crittenden, stated:

> [T]his was essentially a funding mechanism that was used as we structured CDOs up until I believe the end of 2005.  So we would sell a structured CDO to a customer.

We would provide a liquidity put essentially to that customer . . . [a]nd this was all backed by subprime collateral . . . .

We decided actually to buy the commercial paper associated with that during the course of the summer and as a result, that came back on our books . . . . And so that's what the $25 billion [a portion of the just disclosed $43 billion in CDOs] is made up of.

90.     Citigroup disclosed the following in its 2007 Form 10-K:

In certain CDO transactions underwritten by the Company during 2003-2006, the senior funding of the CDOs was in the form of short-term commercial paper. In order to facilitate the issuance of commercial paper by the CDO, the Company wrote a put option ("liquidity puts") to the CDO to benefit the commercial paper investors, which was accounted for as a derivative. The total notional amount of these written liquidity puts was approximately $25 billion.

91.     As described in detail above, Citigroup's liquidity puts on commercial paper CDOs are considered variable interests under FIN 46(R) because "they protect[ed] holders of other interests from suffering losses."   Citigroup was at all material times committed to back-stopping the commercial paper CDOs in the event they failed. This obligation required Citigroup to consolidate the full value – $25 billion – of the commercial paper CDOs (which the liquidity puts protected) onto its balance sheet. However Citigroup failed to comply with FIN 46(R) and as a result, its Relevant Period financial statements were not prepared in accordance with GAAP.

### 3.     Citigroup Failed to Record Adequate Loan Loss Reserves on Its Portfolio of Subprime Mortgages in Violation of SAB 102, SFAS 114 and SFAS 5

92.     Defendants caused Citigroup to misrepresent the loss exposure associated with its subprime mortgage portfolio by failing to record adequate loan loss reserves in violation of GAAP. Under GAAP, Citigroup was required to set aside loss reserves for *all* loans that were likely to become impaired in addition to reserving for loans that were already impaired.

93.     Defendants caused Citigroup to engage in the purchase of inherently risky residential subprime mortgages which, during the Relevant Period, were carried at inflated values on

Citigroup's balance sheet.  By the end of 2007, Citigroup had direct exposure to roughly $87 billion in subprime mortgages, including over $60 billion of high risk HELOCs and second mortgages. Because of the inherent risks associated with subprime home loans, GAAP required that defendants evaluate the loans in Citigroup's subprime mortgage portfolio for possible impairment and establish appropriate loan loss reserves at the end of each quarter.  In doing so, at the end of each quarter defendants were required to establish  loss reserves for *all* loans that were likely to become impaired in addition to reserving for loans that were already impaired.  The reserves for loans likely to become impaired were to be based on various risk characteristics and loss exposure specific to the Company's own mortgage portfolio as well as external data and red flags as to the state of the subprime mortgage market and housing market in general.  Defendants, however, failed to comply with these GAAP requirements and, as a result, Citigroup's inadequate loan loss reserves materially misrepresented the Company's loss exposure on its portfolio of subprime mortgages.  For example, Citigroup's total loan loss reserves actually were reduced by 50% from 2003 (2.64% of total loans outstanding) to 2006 (1.32% of total loans outstanding), despite the fact that the quality of Citigroup's loan portfolio, including the growing subprime mortgage portfolio, had significantly deteriorated.

94.    GAAP required defendants to record loan loss reserves that matched the deteriorating credit quality of Citi's subprime mortgage portfolio and to set aside loss reserves for *all* loans that were likely to become impaired in addition to reserving for loans that were already impaired.  The SEC highlighted this fundamental GAAP principle in a November 2000 speech by the Deputy Chief Accountant of the U.S. Securities & Exchange Commission to the AICPA National Conference on Banks and Savings Institutions:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio.  *As credit quality*

*deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred.*

95.     SEC Staff Accounting Bulletin No. 102 ("SAB 102"), *Selected Loan Loss Allowance Methodology and Documentation Issues*, states that: "A registrant's loan loss allowance methodology generally should . . . [c]onsider *all known relevant internal and external factors* that may affect loan collectability, . . . [and] . . . *[c]onsider the particular risks inherent in different kinds of lending* . . . ."  The SEC further stated in SAB 102 that:

> In developing loss measurements, *registrants should consider the impact of current environmental factors* and then document which factors were used in the analysis and how those factors affected the loss measurements. Factors that should be considered in developing loss measurements include the following:

- Levels of and trends in delinquencies and impaired loans;

- *Levels of and trends in charge-offs* and recoveries;

- Trends in volume and *terms of loans*;

- *Effects of any changes in risk selection and underwriting standards*, and other changes in lending policies, procedures, and practices;

- Experience, ability, and depth of lending management and other relevant staff;

- *National and local economic trends and conditions*;

- Industry conditions; and

- Effects of changes in *credit concentrations*.

Similarly, the AICPA Audit and Accounting Guide for Finance Companies states:

> [P]resent conditions such as the *amount of delinquent receivables* and the number of days they are past due; *local, national, and international economic trends*; credit policies and procedures; and the mix of receivables *should be taken into account in evaluating the adequacy of the allowance*.

96.     SFAS 114 and Emerging Issues Task Force ("EITF") Topic No. D-80, *Application of SFASB Statements No. 5 and No 114 to a Loan Portfolio*, also clearly describe that an evaluation of loan impairment must be made in the context of current information and events, stating in part:

> A loan is ***impaired*** when, ***based on current information and events***, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. ***All amounts due according to the contractual terms*** means that both the contractual interest payments and contractual principal payments will be collected as scheduled in the loan agreement. ***Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of current information and events when assessing a loan*** that has been identified for evaluation under Statement 114.

97.     In a hypothetical example included in EITF Topic D-80, the EITF described how current environmental factors impact the evaluation of loan impairment in light of historical loss statistics. EITF Topic D-80 states in part:

> The bank would ***consider the effect of the current economic downturn to assess whether a loss has been incurred*** in that group of loans at the balance sheet date and to estimate the amount of loss.  In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing. ***However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based***.

98.     GAAP requires the establishment of loss reserves for ***all*** loans that are likely to become impaired in addition to reserving for loans that were already impaired.  However, in its 2007 Form 10-K, Citigroup was forced to record a $3 billion increase to reserves and admit that it had failed to establish adequate reserves.  Specifically, Citigroup attributed the $3 billion charge to a "*weakening of leading credit indicators including delinquencies on first and second mortgages and deterioration in the housing market*."  However, as illustrated in the chart below, by the fourth quarter of 2005 and accelerating into the first half 2006, it was already widely known that the U.S. housing market was collapsing.  GAAP required Citigroup to significantly increase its loss reserves

at that time – *not to wait until 24 months later to acknowledge the losses inherent in the subprime mortgage portfolio as a result of declining home prices*.





In fact, it is clear that by 2006 Citigroup was aware of the decline in housing prices and expected the decline to continue into 2007. Thomas Maheras, the bank's former trading chief who served as co-CEO of Citigroup Markets and Banking, testified before the FCIC that the Company was seeking to reduce its exposure to subprime mortgage products as early as 2006 because, as Maheras testified, "*we were negative on subprime* . . . . We had in our base case that *housing was going down during '07 and would likely continue*." Consequently, Citigroup was required to increase its loss reserves dramatically in 2006 and 2007. By failing to record, at a minimum, the $3 billion of loss reserves, Citigroup misrepresented its true loss exposure and value of its portfolio of subprime mortgages and, therefore, issued financial statements that were not in compliance with GAAP.

99.     Under GAAP, defendants were required to establish reserves for *all* loans that were

likely to become impaired.  EITF Topic No. D-80 states:

- *Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP.*  The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

*          *          *

- . . . [S]ome loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have *specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics*. Loans in the first category must be accounted for under FAS 114 and *loans in the second category should be accounted for under FAS 5*.  Under FAS 5, *a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan*. [fn 5]  Moreover, current GAAP . . . emphasize that *the loss does not have to be virtually certain in order to be recognized*.

Similarly, SFAS 5 states that "*accrual shall be made even though the particular receivables that*

*are uncollectible may not be identifiable*."

100.     In a response to a 2008 SEC comment letter, Citigroup admitted in a letter filed with

SEC that it had failed to reserve for loans in this category *(loans with specific characteristics that*

*indicate that there would be probable loss even though the loss could not be identified with a*

*specific loan*).  In response to the SEC's questioning of Citigroup's loan losses, Citigroup

acknowledged that for "the quarter ended September 30, 2007, the change in estimate decreased the

Company's pretax net income by approximately $900 million, or $0.11 per diluted share," stating:

> *[T]he Company changed its estimate of loan losses* inherent in the Global Consumer portfolio *that were not yet visible in delinquency statistics*. The changes in estimate were accounted for prospectively in accordance with FASB Statement No. 154, "Accounting Changes and Error Corrections" (SFAS 154).

101.     Of the $1.3 billion of loan losses that Citigroup admitted should have been recorded

during the first three quarters of 2007, more than one-half or approximately $700 million was

- 39 -

directly related to the U.S. consumer portfolio which consisted of Citigroup's subprime mortgage portfolio. By choosing to record this charge prospectively under SFAS 154, Citigroup has admitted that the effect of the change in estimate of loan losses was material.[9]

102.    Citigroup's loan loss reserves remained understated during the fourth quarter of 2007 and the first quarter of 2008, as the loss reserves still covered only 2% of Citigroup's loan portfolio. Indeed, during the third and fourth quarters of 2008, Citigroup increased its reserves by more than $9 billion, or 45%, to cover over 4% of the loan portfolio.

103.    By failing to increase its loan loss reserves to appropriate levels in accordance with GAAP, as described herein, Citigroup misrepresented the loss exposure associated with its subprime mortgage portfolio.

### 4.    Citigroup Failed to Record Adequate and Timely Write-downs on CDOs in Violation of SFAS 157 and SFAS 115

104.    During the Relevant Period, under GAAP Citigroup was required to write down its CDOs to fair market value. SFAS No. 157, *Fair Value Measurements*, which Citigroup adopted effective January 1, 2007, defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." GAAP further requires that when measuring fair value, a company must use the most verifiable data or "inputs." SFAS No. 157 instructs at ¶21 that "[v]aluation techniques used to measure fair value shall maximize the use of observable inputs . . . and minimize the use of unobservable inputs." Observable inputs are assumptions used to price an asset or liability "based on market data obtained from sources independent of the reporting entity," while unobservable inputs "reflect the reporting entity's own assumptions." SFAS No. 157 establishes a hierarchy of

---

[9]    SFAS 154, ¶22.

inputs. The most observable inputs, based on quoted prices in active markets for identical assets or liabilities, are classified as "Level 1," while the lowest priority is given to unobservable inputs classified as "Level 3." "Level 2" is an intermediate type of observable input that includes quoted prices for "similar assets or liabilities"; quoted prices for assets/liabilities "in markets that are not active"; inputs other than quoted prices; or inputs "derived principally . . . by correlation or other means."

105.   Citigroup's 2007 Form 10-K stated that "the Company accounts for its CDO super senior subprime direct exposures and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings," and that the Company had "refined" its CDO valuation methodology during the fourth quarter of 2007 "to reflect ongoing unfavorable market developments."

106.   Citigroup further stated in its 2007 Form 10-K that its CDOs with subprime exposure were not subject to valuation based on observable transactions; that they were Level 3 assets subject to valuation based on significant unobservable inputs; and were classified in Level 3 of the fair-value hierarchy throughout 2007.  Similarly, Citigroup's third quarter 2007 Form 10-Q stated that the "super senior" tranches of subprime-related CDOs were not subject to valuation based on observable market transactions. The 10-Q stated that the fair value of these senior exposures was "based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value."

107.   As detailed below, Citigroup's valuation method for its CDOs violated GAAP. First, Citigroup was aware that it was unable to sell its CDOs at face value, and therefore carrying them on the books at face value violated SFAS 157, which required the value to reflect "the price that would be received" in an open market transaction.  According to the FCIC Report and testimony from

Richard Bookstaber, Citigroup's former head of risk management in the late 1990s, Citigroup was reporting its CDOs at values for which they could not be sold. Bookstaber testified that prior to the fall of 2007, Citigroup was quietly subsidizing its CDO business via mispricing, which was then being added to Citigroup's balance sheet and carried at inflated values.

108. Second, Citigroup did not minimize the use of unobservable Level 3 inputs and maximize the use of observable Level 2 inputs. Specifically, in violation of SFAS 157, Citigroup used an unobservable Level 3 input to value mezzanine CDOs when an observable Level 2 input – the ABX and TABX indices – was available. Citigroup ignored the ABX and TABX indices[10] despite the fact that the indices were objective, directly observable, *real-time* indicators of the value of Citigroup's CDO exposures. Not only did Citigroup participate in the creation of the ABX, analysts following Citigroup used the ABX index as a general proxy for estimated ABS CDO deterioration. Additionally, the SEC considers the ABX a "relevant market ind[ex]" for CDO valuation,[11] and the American Institute of Certified Public Accountants' Center for Audit Quality has

---

[10] The ABX index was created in January 2006 when several investment banks, including Citigroup, collaborated with Markit Group Limited, a provider of financial data, to launch the first ABS pricing index. The ABX Index measures the cost of purchasing "protection" for subprime RMBS and CDOs. This "protection," in the form of Credit Default Swaps ("CDS"), is the equivalent of purchasing insurance on the value of the ABS security. The ABX tracks the cost of buying and selling CDS protection for selected RMBS tranches. As the price of buying credit protection for the RMBS underlying the ABX index increases, the ABX index declines – thus indicating a decline in value of the associated RMBS. There are different ABX indices for different RMBS tranches – differentiated by year of issuance and credit rating of the subprime collateral at the time of issuance (from AAA to BBB).

The TABX index, launched in February 2007, tracks the price of CDS insuring the BBB and BBB- tranches of the ABX indices, but also takes into account varying levels of subordination. The TABX mimics the capital structure of a typical mezzanine CDO because it differentiates six BBB or lower-rated tranches from the first dollar of loss to the most senior tranches.

[11] *See* March 2008 "Dear CFO" letter from SEC to public companies.

stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans." Significantly, all other large investment banks also used the ABX index for RMBS and CDO pricing.

109.    By February 2007, the ABX indices for BBB and BBB- RMBS tranches had suffered serious declines – with BBB- tranches down as much as 60%. During that time, market participants anticipated that the values of junior tranche RMBSs were going to zero.[12]  The TABX indices tracking mezzanine CDO tranches also plunged. Indeed, the TABX index for super senior mezzanine CDO tranches had dropped to 85% of par. TABX declines for more junior mezzanine CDO tranches were also significant: double-A tranches fell below 60%; single-A tranches below 50%; and triple-B tranches below 40%. By September 30, 2007, the ABX triple-B indices had fallen to 30%, while the TABX indices for all junior mezzanine CDO tranches showed such tranches to be effectively worthless. The TABX index for mezzanine super seniors had fallen to 33%. In addition, ABX indices for higher RMBS tranches also showed substantial declines: single-A ABX indices were at 50%, while double-A ABX indices were at 80%.

110.    As of September 30, 2007, Citigroup had $8.3 billion in mezzanine CDOs which it valued at face value, despite the fact that the TABX indices for mezzanine CDOs suffered substantial declines. The mezzanine CDOs should have been valued at $2.7 billion, or more than *65% less* than the $8.3 billion included on Citigroup's balance sheet. In the fourth quarter of 2007, Citigroup belatedly wrote down its mezzanine CDOs by $5.2 million, or 63%, an amount still less than GAAP required.

---

[12]    Jody Shenn & Shannon D. Harrington, *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*, Bloomberg, Feb. 22, 2007.

111.    Eventually Citigroup's CFO, Gary Crittenden, admitted the relevance of the ABX indices with respect to the value of Citigroup's assets in an interview regarding the decline in the value of AAA- rated mortgage-backed debt: *"[T]he best way to kind of get an outside perspective on this is to look at the ABX Indices*."[13]  In addition, during Citigroup's January 15, 2008 investor conference call, Crittenden admitted that the ABX indices were useful in valuing its CDOs. Analyst Guy Moszkowski stated: "[Y]ou initially said that there was really nothing observable that you could use to mark these and yet you did at the end say that you did somehow incorporate the ABX indices. So maybe you can clarify for us a little bit how you did that." Crittenden responded that the ABX index was a "useful crosscheck." In addition, Citigroup's May 2, 2008 Form 10-Q disclosed that the Company had made two corrections to its valuation model for CDOs Citigroup dubbed "refinements." One of the two modifications was to use the ABX index as a source of the "discount rate" to apply against Citigroup's valuation model in determining fair value. Despite these acknowledgements concerning the ABX index that occurred later in the Relevant Period, the ABX index was closely tracked and utilized by market participants in the ABS market since its launch in January 2006. Citigroup's affirmative decision to not utilize the indices in pricing its CDOs during the Relevant Period was a violation of the GAAP that required Citigroup to record its CDOs at fair value.

112.    Additionally, Citigroup used defective assumptions regarding the degree of correlation. Each CDO consisted of multiple RMBS, which themselves were composed of thousands of mortgages. Thus, while each CDO purported to have extensive diversification, just the opposite was true – they did not provide the degree of non-correlation necessary to make

---

[13]    Grace Wong, *Behind Wall Street's subprime fear index*, CNNMoney.com, *available at* http://money.cnn.com/galleries/2007/news/0711/gallery.abx_index/4.html.

diversification effective.  In fact, because each RMBS tranche was comprised of subprime mortgages, each tranche actually contained *highly* correlated assets.  A BBB-rated RMBS tranche contained mortgages that were somewhat likely to default; a BBB-rated CDO tranche contained tens of thousands of mortgages that shared the same likelihood of default. Further, the diversification provided within each RMBS was actually reversed in the CDO, as explained in a Citigroup quantitative credit strategy and analysis group report for investors.[14]  Thus, losses were likely to spread widely across the CDO and the degree of correlation actually increased with each tranche. Accordingly, the correlation was higher for the super senior tranches, rendering these super senior tranches extremely vulnerable to losses from more junior tranches, and far riskier than their name and AAA-rating misleadingly suggested.

### F.    Citigroup's SEC Filings Contained False and Misleading Statements

113.    **Citigroup's 2004 10-K**:  Citigroup filed its 2004 Annual Report on Form 10-K ("2004 10-K") on March 28, 2005.  The 2004 10-K was incorporated by reference in the Offering Documents.

114.    The 2004 10-K was false and misleading for the following reasons:

(a)    Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)    Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

115.    In addition, Citigroup's 2004 10-K contained the following statement concerning Citigroup's "Allowance for Credit Losses":

---

[14]    *See CDO of ABS subprime exposure assessed*, Structured Credit Investors, Mar. 28, 2007.

For Consumer [loans], each portfolio of smaller-balance, homogeneous loans, including consumer mortgage, installment, revolving credit, and most other consumer loans, is collectively evaluated for impairment. ***The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio, based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions***.

116.    This statement was false and misleading because:

(a)    Citigroup's impairment analysis, contained therein, ignored recent trends such as downturns in the housing market and failed to properly evaluate "probable losses inherent in the portfolio."

(b)    In calculating its reserves, Citigroup was required under GAAP to account for assets reasonably likely to default in the future. Instead, Citigroup calculated its reserves based solely on assets that had already defaulted, which reported loan loss reserves were materially false and misleading and provided an inaccurate picture of Citigroup's financial health.

(c)    By failing to increase its loan loss reserves to appropriate levels, Citigroup misled investors and indicated that its exposure to loan defaults was less than it actually was. Understating the loan loss reserves also had the effect of overstating Citigroup's earnings.

117.    **Citigroup's Second Quarter 2005 10-Q**:  Citigroup filed its second quarter 2005 Report on Form 10-Q ("2Q 2005 10-Q") on August 4, 2005.  The 2Q 2005 10-Q was incorporated by reference in the Offering Documents.

118.    **Citigroup's Third Quarter 2005 10-Q**:  Citigroup filed its third quarter 2005 Report on Form 10-Q ("3Q 2005 10-Q") on November 4, 2005.  The 3Q 2005 10-Q was incorporated by reference in the Offering Documents.

119.    Citigroup's 2Q 2005 and 3Q 2005 10-Qs were each false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

120.    **Citigroup's 2005 10-K**:  Citigroup filed its 2005 Annual Report on Form 10-K ("2005 10-K") on February 24, 2006.  The 2005 10-K was incorporated by reference in the Offering Documents.

121.    Citigroup's 2005 10-K was false and misleading for each of the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

122.    Citigroup's 2005 10-K contained the following statement concerning Citigroup's "Allowance for Loan Losses":

> For consumer loans . . . , each portfolio of smaller-balance, homogeneous loans – including consumer mortgage, installment, revolving credit, and most other consumer loans – is collectively evaluated for impairment. *The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions*.

123.    This statement was false and misleading because:

(a)     Citigroup's impairment analysis, contained therein, ignored recent trends such as downturns in the housing market and failed to properly evaluate "probable losses inherent in the portfolio."

(b)     In calculating its reserves, Citigroup was required under GAAP to account for assets reasonably likely to default in the future. Instead, Citigroup calculated its reserves based solely on assets that had already defaulted, which reported loan loss reserves were materially false and misleading and provided an inaccurate picture of Citigroup's financial condition.

(c)     Citigroup's loan loss reserves decreased 20% from 2.05% the previous year to just 1.68%, far less than the 2.64% it maintained just two years prior when the loans on Citigroup's balance sheet were much less risky.

(d)     By failing to increase its loan loss reserves to appropriate levels, Citigroup misled investors and indicated that its exposure to loan defaults was less than it actually was. Understating the loan loss reserves also had the effect of overstating Citigroup's earnings.

124.    **Citigroup's First Quarter 2006 10-Q**: Citigroup filed its first quarter 2006 Report on Form 10-Q ("1Q 2006 10-Q") on May 5, 2006. The 1Q 2006 10-Q was incorporated by reference in the Offering Documents.

125.    The 1Q 2006 10-Q was false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

126.    **Citigroup's Second Quarter 2006 10-Q**:  Citigroup filed its second quarter 2006 Report on Form 10-Q ("2Q 2006 10-Q") on August 4, 2006.  The 2Q 2006 10-Q was incorporated by reference in the Offering Documents.

127.    Citigroup's 2Q 2006 10-Q was false and misleading for the following reasons:

(a)    Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)    Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)    Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(d)    Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 8.51%.  Citigroup was not well capitalized.  If Citigroup's loan loss reserves had been increased as required by GAAP, and if it had properly disclosed the commercial paper CDOs, Citigroup's Tier 1 capital ratio would have been materially lower.

128.    **Citigroup's Third Quarter 2006 10-Q**:  Citigroup filed its third quarter 2006 Report on Form 10-Q ("3Q 2006 10-Q") on November 3, 2006.  The 3Q 2006 10-Q was incorporated by reference in the Offering Documents.

129.    Citigroup's 3Q 2006 10-Q was false and misleading for the following reasons:

(a)    Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)    Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(d)     Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 8.64%. Citigroup was not well capitalized. If Citigroup's loan loss reserves had been increased as required by GAAP, and if it had properly disclosed the commercial paper CDOs, Citigroup's Tier 1 capital ratio would have been materially lower.

130.    **Citigroup's 2006 10-K**:  Citigroup filed its 2006 Annual Report on Form 10-K ("2006 10-K") on February 23, 2007. The 2006 10-K was incorporated by reference in the Offering Documents.

131.    Citigroup's 2006 10-K was false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(d)     Citigroup failed to record adequate and timely write-downs on CDOs in violation of SFAS 157 and SFAS 115, as detailed above in ¶¶104-112.

(e)     Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 8.59%. Citigroup was not well capitalized. If Citigroup's loan loss reserves had been increased as required by GAAP, if it had properly disclosed the commercial paper CDOs, and if it had reported fair market values for its subprime-related assets, Citigroup's Tier 1 capital ratio would have been materially lower.

132.    The 2006 10-K contained the following statement concerning Citigroup's "Allowance for Loan Losses":

> For Consumer loans . . . , each portfolio of smaller-balance, homogeneous loans – including consumer mortgage, installment, revolving credit, and most other consumer loans – is collectively evaluated for impairment. ***The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions***.

133.    This statement was false and misleading for the following reasons:

(a)    Citigroup's impairment analysis ignored recent trends such as downturns in the housing market and failed to properly evaluate "probable losses inherent in the portfolio."

(b)    When calculating its reserves, Citigroup was required under GAAP to account for assets reasonably likely to default in the future. Instead, Citigroup calculated its reserves based solely on assets that had already defaulted. Thus, Citigroup's reported loan loss reserves were materially false and misleading and provided an inaccurate picture of Citigroup's financial condition.

(c)    Citigroup's loan loss reserves decreased more than 20% from the 1.68% set aside the previous year to just 1.32%, and almost 40% below the 2.64% it maintained in 2003 when Citigroup's loans were much less risky.

(d)    By failing to increase its loan loss reserves to appropriate levels, Citigroup misled investors and falsely represented that its exposure to loan defaults was less than it actually was. Understating the loan loss reserves also had the effect of overstating Citigroup's earnings.

134.    **Citigroup's First Quarter 2007 10-Q**: Citigroup filed its first quarter 2007 Report on Form 10-Q ("1Q 2007 10-Q") on May 4, 2007. The 1Q 2007 10-Q was incorporated by reference in the Offering Documents.

135.    Citigroup's 1Q 2007 10-Q was false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(d)     Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*, as detailed above in ¶¶104-112.

(e)     Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 8.26%. Citigroup was not well capitalized. If Citigroup's loan loss reserves had been increased as required by GAAP, if it had properly disclosed the commercial paper CDOs, and if it had reported fair market values for its subprime-related assets, Citigroup's Tier 1 capital ratio would have been materially lower.

136.    **Citigroup's Second Quarter 2007 10-Q**: Citigroup filed its second quarter 2007 Report on Form 10-Q ("2Q 2007 10-Q") on August 3, 2007. The 2Q 2007 10-Q was incorporated by reference in the Offering Documents.

137.    Citigroup's 2Q 2007 10-Q was false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to consolidate or disclose off-balance-sheet liquidity puts *in violation of FIN 46(R)*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(d)     Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*, as detailed above in ¶¶104-112.

(e)     Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 7.91%. In fact, if Citigroup had increased its loan loss reserves as required by GAAP, and if it had properly disclosed its CDOs and other credit market assets as detailed above at ¶¶80-85, Citigroup's Tier 1 capital ratio would have been materially lower.

138.     **Citigroup's Third Quarter 2007 10-Q**: Citigroup filed is third quarter 2007 Report on Form 10-Q ("3Q 2007 10-Q") on November 5, 2007. The 3Q 2007 10-Q was incorporated by reference in the Offering Documents.

139.     Citigroup's 3Q 2007 10-Q was false and misleading for the following reasons:

(a)     Citigroup failed to disclose that it had direct exposure to as much as $66 billion of CDO exposure *in violation of SFAS 107*, as detailed above in ¶¶80-85.

(b)     Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶86-91.

(c)     Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*, as detailed above in ¶¶92-103.

(d)     Citigroup misrepresented the quality of its SIV assets, as detailed above in ¶¶74-76.

(e)     Citigroup misrepresented that it was well capitalized and falsely reported its Tier 1 capital ratio at 7.32%. In fact, if Citigroup had increased its loan loss reserves as required by GAAP, and if it had properly disclosed its CDOs and other credit market assets as detailed above at ¶¶80-85, Citigroup's Tier 1 capital ratio would have been materially lower.

140.    **Citigroup's 2007 10-K**:  Citigroup filed its 2007 Annual Report on Form 10-K

("2007 10-K") on February 22, 2008.  The 2007 10-K was incorporated by reference in the Offering

Documents.

141.    The 2007 10-K was false and misleading for the following reasons:

(a)     Citigroup failed to record adequate loan loss reserves on its subprime

mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶92-103.

(b)     Citigroup failed to record adequate and timely write-downs on CDOs *in*

*violation of SFAS 157 and SFAS 115*, as detailed above in ¶¶104-112.

(c)     Citigroup represented that it was well capitalized and falsely reported its

Tier 1 capital ratio.  Specifically, the 2007 10-K stated that Citigroup had "maintained its 'well-

capitalized' position with a Tier 1 Capital Ratio of 7.12% at December 31, 2007."  Citigroup was not

well capitalized.  If Citigroup's loan loss reserves had been increased as required by GAAP, if it had

properly disclosed the commercial paper CDOs, and if it had reported fair market values for its

subprime-related assets, Citigroup's Tier 1 capital ratio would have been materially lower.

142.    The 2007 10-K contained the following statement concerning Citigroup's "Allowance

for Loan Losses":

> For Consumer loans . . . , each portfolio of smaller-balance, homogeneous
> loans – including consumer mortgage, installment, revolving credit, and most other
> consumer loans – is collectively evaluated for impairment. *The allowance for credit*
> *losses attributed to these loans is established via a process that estimates the*
> *probable losses inherent in the portfolio based upon various analyses. These*
> *include migration analysis, in which historical delinquency and credit loss*
> *experience is applied to the current aging of the portfolio, together with analyses*
> *that reflect current trends and conditions*.

143.    This statement was false and misleading for the following reasons:

(a)     Citigroup's impairment analysis ignored recent trends such as downturns in

the housing market and failed to properly evaluate "probable losses inherent in the portfolio."

(b)      When calculating its reserves, Citigroup was required under GAAP to account for assets reasonably likely to default in the future. Instead, Citigroup calculated its reserves based solely on assets that had already defaulted. Thus, Citigroup's reported loan loss reserves were materially false and misleading, and provided an inaccurate picture of Citigroup's financial condition.

(c)      Citigroup reported a reserve of only 2.07% of its total net loan balance – far less than the 2.64% it maintained in 2003 when Citigroup's loans were much less risky.

(d)      By failing to increase its loan loss reserves to appropriate levels, Citigroup misled investors and falsely represented that its exposure to loan defaults was less than it actually was. Understating the loan loss reserves also had the effect of overstating Citigroup's earnings.

144.     **Citigroup's First Quarter 2008 10-Q**: Citigroup filed its first quarter 2008 Report on Form 10-Q ("1Q 2008 10-Q") on May 2, 2008. The 1Q 2008 10-Q was incorporated by reference in the Offering Documents.

145.     Citigroup's 1Q 2008 10-Q was false and misleading for the following reasons:

(a)      Citigroup failed to record adequate loan loss reserves on its subprime mortgage portfolio *in violation of SAB 102, SFAS 5 and SFAS 114*, as detailed above in ¶¶96-103.

(b)      Citigroup failed to record adequate and timely write-downs on CDOs *in violation of SFAS 157 and SFAS 115*, as detailed above in ¶¶104-112.

(c)      Citigroup represented that it was well capitalized and falsely reported its Tier 1 capital ratio at 7.74%. Citigroup was not well capitalized. If Citigroup's loan loss reserves had been increased as required by GAAP, if it had properly disclosed the commercial paper CDOs, and if it had reported fair market values for its subprime-related assets, Citigroup's Tier 1 capital ratio would have been materially lower.

## VIII.  LOSS CAUSATION

146.    Because Citigroup misrepresented its true financial health starting at least by October 12, 2005, it was able to tap the capital markets more cheaply at the expense of plaintiff and members of the proposed Class.  Had the Euro Notes investors known the truth, they would have required a bigger discount to face (or higher coupon payments) to compensate them for the increased risk they were actually taking.  In essence, Euro Notes investors were buying junk bonds, but were duped into paying investment-grade prices.

147.    The 26 Euro Notes that are the subject of this action had an aggregate face value of approximately $30 billion.  As Citigroup investors began to finally learn in February 2009 that Citigroup might be insolvent, the Euro Notes lost, in the aggregate, approximately $9 billion in value.

148.    The notes above declined, most hitting their low price between February 25, 2009 and April 8, 2009, in response to the February 24, 2009 announcement from the U.S. Government of a third bailout of Citigroup which would result in a 34% equity stake.  Accordingly, during this period, the previously hidden risk inherent in the bonds began to materialize, and investors feared the possibility of default by Citigroup.

149.    In a §90 action under the United Kingdom's FSMA, damages are determined at the time of purchase, regardless of future price movements, and the fall in the prices of the 26 Euro Notes in early 2009 confirmed the extent to which investors overpaid at the time of purchase as a result of Citigroup's false statements.

150.    Prices of Euro Notes fell after multiple corrective disclosures made by Citigroup and after the undisclosed risks inherent in the notes began to materialize in early 2009, illustrating that Citigroup's false statements caused Euro Notes investors to overpay for the Euro Notes, and thus caused their losses.

IX.    **STATUTE OF LIMITATIONS**

151.    Claims brought pursuant to §90 of the United Kingdom's FSMA must be brought within six years of discovery by an investor that it has a claim.

152.    Here, the first date that investors knew they had a claim was less than six years prior to filing this Complaint, and thus this claim has been asserted within the applicable limitations period.

X.    **CLASS ALLEGATIONS**

153.    Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or acquired Euro Notes issued by Citigroup pursuant to the Programmes during the Relevant Period and were damaged thereby (the "Class"). Excluded from the Class are Citigroup, its officers and directors (current and former), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any defendant has or had a controlling interest.

154.    The members of the proposed Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to plaintiff and can only be ascertained through appropriate discovery, plaintiff reasonably believes that there are thousands of members in the Class. Record owners and other members of the Class may be identified by records maintained by defendants and their transfer agents, and may be notified of the pendency of the action by mail, the Internet or publication using the form of notice similar to that customarily used in securities class actions.

155.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' violations of §90 of the United Kingdom's FSMA, as amended.

156.     Plaintiff will fairly and adequately represent the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

157.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  These common questions of law and fact include:

(a)     whether defendants violated the FSMA as alleged herein;

(b)     whether the SEC filings incorporated by reference in the Base Prospectuses and other supplemental public offering materials relating to the sale of the Euro Notes contained materially untrue statements or omitted statements of material fact;

(c)     the extent of damages suffered by the Class, and

(d)     the proper measure of damages.

158.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to obtain individual redress.  There will be no difficulty in the management of this action as a class action.

## COUNT
### Section 90 of the United Kingdom's FSMA

159.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

160.     This Count is brought pursuant to §90 of the FSMA, as amended by Statutory Instrument 2005 No. 1433 (the "Prospectus Regulations 2005"), against all defendants, seeking damages in relation to plaintiff's and other Class members' purchases of the Euro Notes, including purchases in the offerings and in the market therefrom.

- 58 -

161.     The Euro Notes were issued pursuant to Base Prospectuses and supplements thereto which were issued by defendants to plaintiff and other members of the proposed Class.

162.     By their terms, the Base Prospectuses and supplements for the Euro Notes are governed by English law.

163.     Defendants' made materially false and misleading statements in the Base Prospectuses and supplements by incorporating by reference SEC filings that contained materially false and misleading statements, as alleged herein, and omitted material facts necessary in order to make the statements made therein not misleading.

164.     Section 90 of the FSMA, as amended by Section 6 of the Prospectus Regulations 2005, provides for compensation to investors who purchased securities to which a prospectus or supplementary prospectus applies, and who suffer damages as a result of any untrue or misleading statement in the prospectus or supplementary prospectus, or an omission of information required in order to make the statements made not misleading and required to be included by the FSMA.

165.     Section 90 (via Part 3(6), Appendix 2, of Regulations 2001 to the FSMA) imposes liability on issuers as well as individuals who were directors of corporate issuers at the time when the prospectus was issued.

166.     Luxembourg is a member of the European Economic Area (the "EEA"), and the CSSF is the competent authority in Luxembourg with authority to approve prospectuses under Article 18 of the Prospectus Directive (the "PD") as implemented in Luxembourg.

167.     Prospectuses approved by the competent authority in any EEA member state are treated in the same way as those approved by the United Kingdom's Financial Services Authority ("FSA") if the relevant competent authority provides a certificate of approval and a copy of the approved prospectus to the FSA.

168.     Citigroup applied for a certificate of approval under Article 18 of the PD as implemented in Luxembourg, to be issued by the CSSF to the FSA in the United Kingdom.

169.     Pursuant to Article 18 of the PD, the CSSF is required to provide, and upon information and belief did provide, a certificate of approval and a copy of the approved Citigroup prospectus to the FSA. The Base Prospectuses and supplements are thus treated as having been approved by the FSA.

170.     Plaintiff and other members of the proposed Class purchased and/or otherwise acquired Euro Notes to which the Base Prospectuses and supplements apply.

171.     Plaintiff and other members of the proposed Class suffered damages as the direct and proximate result of the misrepresentations and omissions alleged herein.

172.     Defendants are responsible for the content of the Base Prospectuses and supplements, and are strictly liable for the misrepresentations contained or incorporated therein and for omitting matters that were required to be included, absent certain limited exceptions not applicable here.

173.     By reason of the foregoing, defendants are liable to plaintiff and other members of the proposed Class for compensation as provided by §90 of the FSMA, as amended.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff on behalf of the Class prays for relief and judgment including:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of the misrepresentations described herein, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding plaintiff and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by a jury on all of the triable issues of this Complaint.

DATED: August 30, 2012                     ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                   SAMUEL H. RUDMAN
                                                   JOSEPH RUSSELLO


                                                   _____
                                                            SAMUEL H. RUDMAN

                                                   58 South Service Road, Suite 200
                                                   Melville, NY  11747
                                                   Telephone:  631/367-7100
                                                   631/367-1173 (fax)
                                                   srudman@rgrdlaw.com
                                                   jrussello@rgrdlaw.com

                                                   ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                   DARREN J. ROBBINS
                                                   MARK SOLOMON
                                                   THEODORE J. PINTAR
                                                   655 West Broadway, Suite 1900
                                                   San Diego, CA  92101-3301
                                                   Telephone:  619/231-1058
                                                   619/231-7423 (fax)
                                                   darrenr@rgrdlaw.com
                                                   marks@rgrdlaw.com
                                                   tedp@rgrdlaw.com

                                                   STEWARTS LAW US LLP
                                                   DAVID A. STRAITE
                                                   535 Fifth Avenue, 4th Floor
                                                   New York, NY  10017
                                                   Telephone:  212/897-3730
                                                   212/897-3733 (fax)
                                                   dstraite@stewartslaw.com

                                                   Attorneys for Plaintiff

## APPENDIX A

During the Relevant Period, Citigroup issued 26 Euro Notes pursuant to a Base Prospectus dated October 12, 2005, October 12, 2006 or October 2, 2007. Each Base Prospectus and the prospectus supplement related to each specific Euro Note incorporated by reference disclosures filed with the United States Securities and Exchange Commission as described below.

**The October 12, 2005 Programme for the Issuance of Euro Medium-Term Notes**:

(a)   Floating Rate Notes Due 2010, issued November 1, 2005 (XS0233760247): The Offering Documents included Citigroup's Base Prospectus dated October 12, 2005 as supplemented and updated by the Final Terms dated October 31, 2005. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and November 4, 2005 From 10-Q (for the period ended September 30, 2005). The offering of the Floating Rate Notes Due 2010 is governed by the laws of England, according to the terms of the Base Prospectus.

(b)   3.625% Fixed/Floating Rate Callable Subordinated Notes Due November 2017, issued November 30, 2005 (XS0236075908): The Offering Documents included Citigroup's Base Prospectus dated October 12, 2005 as supplemented and updated by supplements dated October 28, 2005, and by the Final Terms dated November 28, 2005. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and November 4, 2005 Form 10-Q (for the period ended September 30, 2005). The offering of the 3.625% Fixed/Floating Rate Callable Subordinated Notes Due November 2017 is governed by the laws of England, according to the terms of the Base Prospectus.

(c)   Floating Rate Notes Due 2016, issued May 22, 2006 (XS0243636866): The offering included the issuance of new floating rate notes under the temporary ISIN Code XS0255120577 and the exchange of old notes bearing the ISIN Code XS0243636866; following the exchange, all notes bear the old ISIN Code XS0243636866. The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, and May 11, 2006, and by the Final Terms dated May 18, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); November 4, 2005 Form 10-Q (for the period ended September 30, 2005); and May 5, 2006 Form 10-Q (for the period ended March 31, 2006). The offering of the Floating Rate Notes Due 2016 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(d)    4.5% Fixed Rate Subordinated Notes Due March 2031, issued March 3, 2006 (XS0245936496): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, and February 28, 2006, and by the Final Terms dated March 2, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005; and November 4, 2005 Form 10-Q (for the period ended September 30, 2005). The offering of the 4.5% Fixed Rate Subordinated Notes Due March 2031 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(e)    3.625% Fixed Rate Notes Due March 2011, issued March 28, 2006 (XS0248814401): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, and February 28, 2006, and by the Final Terms dated March 27, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and November 4, 2005 Form 10-Q (for the period ended September 30, 2005). The offering of the 3.625% Fixed Rate Notes Due March 2011 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(f)    2.75% Fixed/Floating Rate Callable Subordinated Notes Due April 2021, issued April 6, 2006 (CH024683192): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, and February 28, 2006, and by the Final Terms dated April 3, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); November 4, 2005 Form 10-Q (for the period ended September 30, 2005); May 5, 2006 Form 10-Q (for the period ended March 31, 2006); and August 14, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 2.75% Fixed/Floating Rate Callable Subordinated Notes Due April 2021 is governed by the laws of England, according to its Base Prospectus.

(g)    5.25% Notes Due June 2011, issued June 14, 2006 (XS0257598341): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, and May 11, 2006, and by the Final Terms dated June 13, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 200; 2005 Form 10-K, filed February 24, 2006; and August 4, 2005 Form 10-Q (for the period ended June 30, 2005). The offering of the 5.25% Notes Due June 2011 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(h)    Floating Rate Notes Due 2013, issued June 28, 2006 (XS0259257003): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented

and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, and May 11, 2006, and by the Final Terms dated June 26, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and May 5, 2006 Form 10-Q (for the period ended March 31, 2006). The offering of the Floating Rate Notes Due 2013 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(i)     Floating Rate Senior Notes Due 2011, issued August 10, 2006 (XS0263792615): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, and May 11, 2006, and by the Final Terms dated August 9, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); May 5, 2006 Form 10-Q (for the period ended March 31, 2006); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the Floating Rate Senior Notes Due 2011 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(j)     3.125% Fixed Rate Senior Notes 2006-2021, issued September 27, 2006 (CH0026791225): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, May 11, 2006, and August 14, 2006, and by the Final Terms dated on or about September 27, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 3.125% Fixed Rate Senior Notes 2006-2021 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(k)     3.95% Fixed Rate Notes Due 2013, issued October 10, 2006 (XS0270148793): The Offering Documents included Citigroup's October 12, 2005 Base Prospectus, as supplemented and updated by supplements dated October 28, 2005, November 14, 2005, February 28, 2006, May 11, 2006, and August 14, 2006, and by the Final Terms dated October 6, 2006. These Offering Documents incorporated by reference Citigroup's 2004 Form 10-K, filed February 28, 2005; 2005 Form 10-K, filed February 24, 2006; August 4, 2005 Form 10-Q (for the period ended June 30, 2005); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 3.95% Fixed Rate Notes Due 2013 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

**The October 12, 2006 Programme for the Issuance of Euro Medium-Term Notes**:

(l)    4.375% Fixed Rate Notes Due 2018, issued November 2, 2006 (XS0273437169): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by the Final Terms dated October 31, 2006. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 4.375% Fixed Rate Notes Due 2018 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(m)    2.75% Fixed Rate Senior Notes 2006-2012, issued November 29, 2006 (CH0027670329): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by the Final Terms dated on or about November 29, 2006. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 2.75% Fixed Rate Senior Notes 2006-2012 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(n)    Floating Rate Notes Due 2012, issued December 12, 2006 (XS0277974076): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by a supplement dated November 14, 2006 and by the Final Terms dated December 8, 2006. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); and November 3, 2006 Form 10-Q (for the period ended September 30, 2006). The offering of the Floating Rate Notes Due 2012 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(o)    Floating Rate Notes Due 2012, issued January 16, 2007 (XS0282530954): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by a supplement dated November 14, 2006 and by the Final Terms dated January 15, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); and November 3, 2006 Form 10-Q (for the period ended September 30, 2006). The offering of the Floating Rate Notes Due 2012 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(p)    4.375% Fixed Rate Notes Due 2017, issued January 30, 2007 (XS0284710257): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by a supplement dated November 14, 2006 and by the Final Terms dated January 29, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); and November 3, 2006 Form 10-Q (for the period ended September 30, 2006).

The offering of the 4.375% Fixed Rate Notes Due 2017 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(q)     Floating Rate Notes Due 2014, issued March 5, 2007 (XS0289239963): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by a supplement dated November 14, 2006 and by the Final Terms dated March 1, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); and November 3, 2006 Form 10-Q (for the period ended September 30, 2006). The offering of the Floating Rate Notes Due 2014 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(r)     4.75% Fixed Rate Notes Due 2017, issued May 31, 2007 (DK0030059092): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by supplements dated November 14, 2006, March 6, 2007 and May 10, 2007, and by the Final Terms dated May 29, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); November 3, 2006 Form 10-Q (for the period ended September 30, 2006); 2006 Form 10-K, filed February 23, 2007; and May 4, 2007 Form 10-Q (for the period ended March 31, 2007). The offering of the 4.75% Fixed Rate Notes Due 2017 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(s)     4.75% Fixed/Floating Rate Callable Subordinated Notes Due May 2017, issued May 31, 2007 (XS0303074883): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by supplements dated November 14, 2006, March 6, 2007 and May 10, 2007, and by the Final Terms dated May 30, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; August 4, 2006 Form 10-Q (for the period ended June 30, 2006); November 3, 2006 Form 10-Q (for the period ended September 30, 2006); 2006 Form 10-K, filed February 23, 2007; and May 4, 2007 Form 10-Q (for the period ended March 31, 2007). The offering of the 4.75% Fixed/Floating Rate Callable Subordinated Notes Due May 2017 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(t)     3.0% Fixed Rate Senior Notes Due March 21, 2019, issued March 21, 2007 (CH0029365100): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by the Final Terms dated March 19, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 3.0% Fixed Rate Senior Notes Due March 21, 2019 is governed by the laws of England, according to its terms as set forth in the Base Prospectus and Final Terms.

(u)     2.875% Fixed Rate Senior Notes Due June 7, 2011, issued June 7, 2007 (CH0030911819): The Offering Documents included Citigroup's October 12, 2006 Base Prospectus, as supplemented and updated by supplements dated November 14, 2006, March 6, 2007 and May 10, 2007, and by the Final Terms dated June 5, 2007. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 2.875% Fixed Rate Senior Notes Due June 7, 2011 is governed by the laws of England, according to its terms as set forth in the Base Prospectus and the Final Terms.

**The October 2, 2007 Programme for the Issuance of Euro Medium-Term Notes**:

(v)     6.4% Fixed Rate Notes Due 2013, issued March 27, 2008 (XS0354858564): The Offering Documents included Citigroup's October 2, 2007 Base Prospectus, as supplemented and updated by supplements dated November 9, 2007 and February 27, 2008, and by the Final Terms dated March 25, 2008. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; November 5, 2007 Form 10-Q (for the period ended September 30, 2007); and 2007 Form 10-K, filed February 22, 2008. The offering of the 6.4% Fixed Rate Notes Due 2013 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(w)     6.8% Fixed Rate Notes Due 2038, issued June 25, 2008 (XS0372391945): The Offering Documents included Citigroup's October 2, 2007 Base Prospectus, as supplemented and updated by supplements dated November 9, 2007, February 27, 2008 and May 7, 2008, and by the Final Terms dated June 24, 2008. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; November 5, 2007 Form 10-Q (for the period ended September 30, 2007); 2007 Form 10-K, filed February 22, 2008; and May 2, 2008 Form 10-Q (for the period ended March 31, 2008). The offering of the 6.8% Fixed Rate Notes Due 2038 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(x)     7.625% Fixed Rate Notes Due 2018, issued April 3, 2008 (XS0355738799): The Offering Documents included Citigroup's October 2, 2007 Base Prospectus, as supplemented and updated by supplements dated November 9, 2007 and February 27, 2008, and by the Final Terms dated April 1, 2008. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; November 5, 2007 Form 10-Q (for the period ended September 30, 2007); and 2007 Form 10-K, filed February 22, 2008. The offering of the 7.625% Fixed Rate Notes Due 2018 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(y)     6.393% Fixed Rate Subordinated Notes Due 2023, issued March 6, 2008 (XS0350626965): The Offering Documents included Citigroup's October 2, 2007 Base Prospectus, as supplemented and updated by supplements dated November 9,

2007 and February 27, 2008, and by the Final Terms dated March 4, 2008. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; November 5, 2007 Form 10-Q (for the period ended September 30, 2007); and the 2007 Form 10-K, filed February 22, 2008. The offering of the 6.393% Fixed Rate Subordinated Notes Due 2023 is governed by the laws of England, according to its terms as set forth in the Base Prospectus.

(z)     6.969% Fixed Rate Notes Due 2027, issued August 6, 2008 (XS0381986453): The Offering Documents included Citigroup's October 2, 2007 Base Prospectus, as supplemented and updated by supplements dated November 9, 2007, February 27, 2008, and May 7, 2008, and by the Final Terms dated August 5, 2008. These Offering Documents incorporated by reference Citigroup's 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; 2007 Form 10-K, filed February 22, 2008; November 5, 2007 Form 10-Q (for the period ended September 30, 2007); and May 2, 2008 Form 10-Q (for the period ended March 31, 2008). The offering of the 6.969% Fixed Rate Notes Due 2027, is governed by the laws of England, according to its terms as set forth in the Base Prospectus.